**NORTH SHORE GAS COMPANY,**
**Plaintiff–Appellee,**

**v.**

**SALOMON INC, Defendant–Appellant.**

**No. 97–2485.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1998.

Decided Aug. 5, 1998.

Laurence A. Silverman, Cahill, Gordon & Reindel, New York City, James H. Schink (argued), Kirkland & Ellis, Chicago, IL, for Plaintiff–Appellee.

Roberta M. Saielli, Richard J. Kissel, Gardner, Carton & Douglas, Chicago, IL, John D. Faught (argued), John Faught & Associates, Denver, CO, for Defendant–Appellant.

Before CUMMINGS, CUDAHY, and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Who should assume responsibility for the cost of an environmental cleanup is the first messy question in what is generally a messy business. North Shore Gas Company filed suit in Illinois federal district court and sought a declaration that it was not liable for a remediation that was taking place in Colorado. After denying defendant Salomon Inc's motion to dismiss or transfer the case, the district court granted summary judgment in favor of North Shore Gas. On appeal, Salomon challenges the district court's decision to entertain this declaratory judgment action, and then raises arguments which require us to decide whether the equitable doctrine of successor liability applies in the context of CERCLA and how far the doctrine reaches. We affirm the denial of the motion to dismiss or transfer, but reverse the declaration that North Shore Gas cannot be held liable for cleanup costs under the doctrine of successor liability.

I. Background

Beginning in the early part of this century, the S.W. Shattuck Chemical Company (Old Shattuck) operated a mineral ore processing plant in Denver, Colorado (the Denver Site). In 1969, Salomon's predecessor-in-interest purchased Old Shattuck and renamed it the S.W. Shattuck Chemical Company, *Inc.* (New Shattuck). From 1969 to 1984, New Shattuck operated the Denver Site as a mineral processing facility. Unfortunately, the activities at the Denver Site were not without environmental costs. In 1983, the Environmental Protection Agency (EPA) placed the Site on its national priorities list. In 1992, the EPA ordered New Shattuck, the current owner of the Site, to remove certain hazardous substances. *See* 42 U.S.C. § 9613(f)(1). Salomon subsequently guaranteed the financial performance of New Shattuck, its wholly-owned subsidiary. At the time of this appeal, remediation costs had exceeded $20 million.

After the EPA charged New Shattuck with liability, the company embarked on a search for entities that might contribute to response costs. It discovered that from 1934 to 1942, North Shore Coke & Chemical Company (the Coke Company) owned 60% of Old Shattuck. In the mid–1930s, the Coke Company had formed North Continent Mines, which mined mineral ores containing vanadium and uranium. North Continent Mines regularly transported radium slimes—a waste product as hazardous as its name suggests—to the Denver Site for processing and disposal.

The Coke Company was incorporated in 1927 by William Baehr, the then-manager (and later president) of the North Shore Gas

Company (the Gas Company), which supplied gas to communities around Waukegan, Illinois. In 1928, the Coke Company built a coke oven plant in Waukegan. The Coke Company sold all of the gas generated at the Waukegan plant to the Gas Company, furnishing more than 80% of the Gas Company's total supply. The Coke Company was also a source of coke for the Gas Company, as well as for other purchasers. The ore processed by Old Shattuck and North Continent Mines was not used to manufacture gas or coke.

From 1927 to 1942, the Coke Company and the Gas Company were closely related entities. Virtually all of the Coke Company's stock was owned by North Continent Utilities Corporation, a holding company that Baehr formed in 1922; North Continent Utilities also owned 100% of the Gas Company's common stock and 2.28% of its preferred stock. The financial reports of North Continent Utilities listed the Coke Company and the Gas Company as consolidated subsidiaries. And the Coke and Gas Companies had virtually identical officers and directors.[1] The companies even issued joint bonds, which were secured by a lien on the assets of both companies. In 1940, a consultant deftly summarized the companies' connection:

> The actual operations of the properties are interdependent. One is dependent on the other as a source of supply. One company is dependent on the other as a market for one of its primary products. Neither company, from a practical standpoint, can operate without the other. Broadly speaking, the two companies represent a single business enterprise.
>
> . . . .
>
> As a consequence of the purchase and sale contract and the [bonds], each company is as concerned with the solvency of the other as it is with its own. Therefore, each is subject to a risk largely beyond the control of the Board of Directors of the particular company. Perhaps the success of this involved situation in the past is largely due to the fact that both companies are controlled by the same interests, operated by a single management, and considered from an operating viewpoint largely as a single business enterprise.

Duff & Phelps Rep. at 113–14 (Aug. 1, 1940). The Coke and Gas Companies thus shared far more than the typical arms-length relationship of most purchasers and suppliers.

This happy union began to unravel in 1940. The companies were facing financial difficulties, since they anticipated that they would be unable to redeem the joint bonds that were due to mature in 1942. In addition, the dividend requirements of the Gas Company's preferred stock were exceeding the company's earning ability. And a committee representing the preferred stockholders of the Gas Company had asserted various mismanagement claims against the Coke Company, North Continent Utilities and Baehr. The Coke Company had also run afoul of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79(k), which sought to eliminate nonutility investments from the utility system. In an effort to address these difficulties, the Coke and Gas Companies submitted a "Plan of Reorganization" to the Securities and Exchange Commission in 1941 (the 1941 Plan). Under the Plan, the Coke Company sold all of its assets to the Gas Company—except the stock in North Continent Mines and Old Shattuck, certain debt owed to the Coke Company and $45,000 in cash—in exchange for shares of the Gas Company. The Coke Company transferred its interest in Old Shattuck and North Continent Mines to North Continent Utilities. The Plan also settled all mismanagement claims by the preferred shareholders, refunded the bonds issued by the Gas and Coke Companies, and recapitalized the Gas Company so that it had only a single class of stock (common).

---

1. In 1941, for example, the officers and directors of the companies were:

| Gas Company | Coke Company |
|---|---|
| | G.L. Aiken |
| W.A. Baehr | W.A. Baehr |
| W.B. Baehr | W.B. Baehr |
| L.M.G. Bouscaren | |
| A.W. Childs | A.W. Childs |
| A.J. Faul | A.J. Faul |
| A.V. Foster | A.V. Foster |
| J.G. Hart | |
| | W.P. Hendricks |
| | J.W. Sykes |
| A.C. Winters | A.C. Winters |

See Letter Transmitting Plan of Reorganization, 11/11/1941.

When New Shattuck went looking for parties to contribute to CERCLA costs, it discovered that the Coke Company was liquidated in 1942, pursuant to the 1941 Plan. North Continent Utilities dissolved in 1954. So New Shattuck seized on North Shore Gas—the only company remaining from the once formidable triumvirate—and demanded that it help pay for the cost of cleaning up the Denver Site. Eventually North Shore Gas filed an action against Salomon in an Illinois federal district court, seeking a declaration that it was not liable for remediation costs associated with the Site. Salomon filed a motion to dismiss or, in the alternative, to transfer the case to Colorado. After the district court denied the motion, North Shore Gas and Salomon filed cross motions for summary judgment. The court granted North Shore Gas' motion and denied Salomon's.

## II. Motion to Dismiss or Transfer Venue

 The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). As is apparent from the use of the word "may," the Act does not obligate courts to issue declaratory judgments. Instead, district courts have wide discretion to decline to hear such actions. *See In re VMS Securities Litigation*, 103 F.3d 1317, 1327 (7th Cir.1996) (collecting cases). Salomon argues that the district court should have exercised this discretion and dismissed the complaint on the grounds that North Shore Gas raced to the courthouse and forum-shopped. We review de novo the district court's decision to allow the action to proceed. *See id.* (noting a split in the circuits over the proper standard and that the Seventh Circuit has settled on de novo review).

 Salomon correctly argues that district courts should decline to hear declaratory judgment actions that have been filed in an attempt to manipulate the judicial process. *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 750 (7th

Cir.1987). However, this action cannot properly be characterized in such negative terms. On January 31, 1994, New Shattuck's attorney sent North Shore Gas a letter demanding reimbursement and indemnification for CERCLA cleanup costs. The letter explained that New Shattuck was Salomon's wholly-owned subsidary and that Salomon had provided financial assurance to the EPA. Representatives of North Shore Gas, New Shattuck and Salomon then attended two settlement meetings—one on April 27, 1994, and the other on November 2, 1994. At the end of the second meeting, Salomon's attorney stated that litigation was inevitable, but did not say which entities would be involved or where the litigation would take place. Approximately one month later, North Shore Gas filed this action in Illinois. Notwithstanding Salomon's arguments to the contrary, North Shore Gas cannot be described as "racing to the courthouse." Settlement negotiations had reached an impasse after an eleven-month effort, and Salomon and New Shattuck had been afforded ample opportunity to file their own suit. And while Salomon would have us believe that North Shore Gas filed the suit to avoid litigating in Colorado, we do not believe that North Shore Gas engaged in such "blatant" forum shopping. Because there were genuine questions—which are not relevant here—about whether a Colorado court could exercise personal jurisdiction over North Shore Gas, it was not immediately apparent that Salomon and New Shattuck would file suit there. In sum, the district court did not err when it allowed North Shore Gas to clarify its obligations by means of a declaratory judgment action.

 Salomon additionally argues that the district court should have dismissed the action because New Shattuck, an allegedly indispensable party, was not part of the case.[2] Rule 19 sets forth a two-part test for ascertaining whether a party is in fact "indispensable." First, the court must determine (1) if in the person's absence, complete relief cannot be accorded among those who are already parties, or (2) if the person claims an interest relating to the subject of the action

---

2. New Shattuck apparently is not subject to service of process in Illinois.

and is so situated that disposition of the action in its absence may (i) impair or impede its ability to protect that interest, or (ii) leave any of the persons already joined subject to a substantial risk of incurring multiple or otherwise inconsistent obligations. *See* Fed. R.Civ.P. 19(a). If the court concludes that one of the criteria of Rule 19(a) is satisfied, it then decides "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed." Fed.R.Civ.P. 19(b). A party is "indispensable" only if the court finds, after a Rule 19(b) inquiry, that the action cannot proceed in its absence. *See Moore v. Ashland Oil, Inc.*, 901 F.2d 1445, 1447 (7th Cir.1990). Here the district court concluded that New Shattuck did not even meet the threshold criteria of Rule 19(a).

 To date this circuit has declined to decide whether a de novo or abuse of discretion standard governs review of a Rule 19 determination. *See United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 478 (7th Cir.1996) (collecting cases). Today we may again postpone that decision, since the district court's ruling withstands either degree of scrutiny. While Salomon argues that "a judgment entered in the case without Shattuck might be prejudicial to Shattuck," Appellant's Br. at 46 (citation and internal quotation marks omitted), Salomon fails to adequately explain why this is so. New Shattuck ceased business operations in 1986 and is bereft of funds. Salomon has assumed responsibility for the costs of remediation. The interests of New Shattuck and Salomon are therefore virtually identical—both want North Shore Gas to contribute to the cost of cleanup. And because New Shattuck is Salomon's wholly-owned subsidiary, any harm to New Shattuck would most likely mean harm to Salomon as well. Because Salomon's "motives and ability to defend" mirror that of

New Shattuck, there is no risk that New Shattuck will be unfairly prejudiced. *See Pujol v. Shearson Am. Express, Inc.*, 877 F.2d 132, 135 (1st Cir.1989). Accordingly, the district court did not err when it denied Salomon's motion to dismiss.[3]

### III. Successor Liability Under CERCLA

Having determined that the action was properly before the district court, we next turn to the grant of summary judgment in favor of North Shore Gas and the question of successor liability. As will become clear, in the discussion that follows we reverse the district court and conclude that North Shore Gas succeeded to the Coke Company's direct CERCLA liabilities. But we are assuming *arguendo*, as did the district court, that the Coke Company incurred CERCLA liability as an operator of Old Shattuck and North Continent Mines. *See* 42 U.S.C. § 9607(a)(2). Given CERCLA's prohibition on transferring liability (in the absence of an indemnification agreement or similar arrangement), the Coke Company would be unable to divest itself of this direct liability by conveying the "dirty" businesses to North Continent Utilities. *See* 42 U.S.C. § 9607(e); *Harley–Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 342, 343 (7th Cir.1994); *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 405 (1st Cir.1993). The Coke Company's liability, however, is by no means a foregone conclusion. *See United States v. Bestfoods*, —— U.S. ——, ——, 118 S.Ct. 1876, 1887, 141 L.Ed.2d 43 (1998) (explaining that a parent corporation incurs direct liability only if it manages, directs or conducts the operations of the subsidiary's facility that are specifically related to pollution). On remand, the district court will have to determine whether the Coke Company was in fact an "operator"—or in other words, whether there were

---

3. Salomon also appeals from the district court's refusal to transfer venue pursuant to 28 U.S.C. § 1404(a). This issue does not warrant extended discussion. District courts have broad discretion with respect to motions to transfer under § 1404(a), and will not be reversed absent a clear abuse of that discretion. *See Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir.1986). Salomon argues that the district court should have transferred the case because (1) important evidence and witnesses are located in Colorado and (2) Colorado has the strongest interest in resolving North Shore Gas' liability. However, Salomon has failed to demonstrate that the evidence and witnesses in Colorado are relevant to the liability of North Shore Gas, and to recognize that Illinois has a strong interest in the fate of North Shore Gas—an Illinois corporation. There was no abuse of discretion by the district court.

any CERCLA liabilities to which North Shore Gas could succeed.[4]

■ Whether a successor corporation may be liable for the cost of a CERCLA cleanup is a question of first impression in this circuit. The issue is not resolved by the plain language of CERCLA, which imposes liability on "covered persons." 42 U.S.C. § 9607(a); *see also* § 9613(f)(1) ("[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title"); § 9613(f)(3)(B) ("[a] person who has resolved its liability to the United States or a State . . . in an administrative or judicially approved settlement may seek contribution from any [potentially liable person]"). As the Third Circuit has noted, it is unsurprising that "as a hastily conceived and briefly debated piece of legislation," CERCLA fails to expressly address corporate successor liability. *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir.1988). However, every circuit confronted with the question has determined that Congress intended successor liability to apply in the context of CERCLA. *See B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir.1996); *John Boyd, supra*; *United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir.1992); *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478 (8th Cir.1992); *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240 (6th Cir.1991); *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir.1990), *overruled on other grounds by Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant*, 132 F.3d 1295 (9th Cir.1997); *Smith Land, supra*. The reasoning of our fellow circuits is persuasive.

CERCLA defines "person" as an "individual, firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity." 42 U.S.C. § 9601(21). Congress has directed the judiciary to apply certain rules of construction to the United States Code; one is that when the word "company" or "association" is used "in reference to a corporation, [it] shall be deemed to embrace the words 'successors and assigns of such company or association.'" 1 U.S.C. § 5. This rule of construction lends credence to the notion that, when Congress defined "person" by listing a variety of terms that apply to business entities, it "intended to include all known forms of business and commercial enterprises." *Anspec*, 922 F.2d at 1247; *see Mexico Feed*, 980 F.2d at 486. Indeed, successor liability is so well-established in corporate doctrine that the Eighth Circuit has suggested Congress would have to explicitly *exclude* successor corporations if it intended to place them beyond CERCLA's reach. *See Mexico Feed*, 980 F.2d at 486; *cf. Bestfoods,* —— U.S. at —— – ——, 118 S.Ct. at 1884–85 (explaining that CERCLA was not intended to rewrite the common law doctrine of piercing the corporate veil).

■ This statutory construction comports with the purposes of CERCLA. When Congress enacted CERCLA, it enabled the federal government to provide an efficacious response to environmental hazards and to assign the cost of that response to the parties who created or maintained the hazards. *See Anspec*, 922 F.2d at 1247. Accordingly, Congress was unlikely to leave a loophole that would enable corporations to die "paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former liabilities." *Mexico Feed*, 980 F.2d at 487; *see Betkoski*, 99 F.3d at 519. Moreover, there is no concern—at least theoretically—about punishing the successor for the acts (or

---

4. Salomon argues that North Shore Gas also incurred direct liability for the Denver Site because it had "nearly the same control over Old Shattuck, [North Continent Mines], and the . . . radium recovery and disposal operations that gave rise to North Shore Coke's direct CERCLA liability. . . ." Appellant's Br. at 25. Of course, *Bestfoods* emphasizes that participation in the activities of the polluting facility, not mere control of the subsidiary, is what results in direct CERCLA liability. *See Bestfoods,* —— U.S. at ——, 118 S.Ct. at 1887. But because we conclude that North Shore Gas succeeded to the Coke Company's CERCLA liabilities—assuming that such liabilities exist—the issue of North Shore Gas' direct liability is inconsequential. That is, if the district court concludes that the Coke Company incurred CERCLA liability, North Shore Gas will be responsible for it. And if the district court concludes that the Coke Company did not incur such liability, then neither did North Shore Gas, since it had "nearly the same control" as the Coke Company.

omissions) of the predecessor; CERCLA is a remedial measure which is aimed only at correcting environmentally dangerous conditions. *See Smith Land*, 851 F.2d at 91. And holding the successor corporation liable for the cost of cleanup is not necessarily unfair, since the successor and its shareholders likely will have derived some benefit from the predecessor's use of the pollutant and the savings that resulted from the hazardous disposal methods. We therefore reach the same result as the other circuits that have considered this issue—that Congress intended the equitable doctrine of successor liability to apply under CERCLA. We note, however, that while CERCLA permits successor liability, it does not require it "unless justified by the facts of each case." *Carolina Transformer*, 978 F.2d at 837; *see also Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir.1995) ("Successor liability is an equitable doctrine, not an inflexible command . . . .").

Most circuits which have construed CERCLA to incorporate successor liability have concluded that the parameters of the doctrine should be fashioned by federal common law. *See Betkoski*, 99 F.3d at 519; *Carolina Transformer*, 978 F.2d at 837–38; *Smith Land*, 851 F.2d at 92; *see also Mexico Feed*, 980 F.2d at 487 n. 9 (declining to decide whether federal common law or state law supplied the rule of decision, but noting that the district court was probably correct in relying on federal common law). Of course, the mere fact that CERCLA is a federal statute does not dictate that "the federal courts should fashion a uniform federal rule," since "[f]requently state rules of decision will furnish an appropriate and convenient measure of the governing federal law." *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant*, 132 F.3d 1295, 1299 (9th Cir.1997). But most circuits have decided that resort to federal common law is warranted because of the need for national uniformity with respect to CERCLA, and the possibility that parties would frustrate the aims of CERCLA by choosing to merge or consolidate under the laws of states "which unduly restrict successor liability." *Smith Land*, 851 F.2d at 91.

Until recently, only the Sixth Circuit had concluded that state law provided the rule of decision for successor liability under CERCLA. *See Anspec*, 922 F.2d at 1248. The Ninth Circuit, however, recently overruled one of its prior decisions and held that it would look to the law of the relevant state to decide issues of successor liability. *See Atchison*, 132 F.3d at 1301–02, *overruling Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260 (9th Cir.1990). The Ninth Circuit explained that two recent Supreme Court decisions, *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) and *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), "call[ed] into question the ease with which Louisiana–Pacific created a set of federal rules for successor liability under CERCLA." *Atchison*, 132 F.3d at 1299. Because CERCLA does not clearly indicate that Congress intended the judiciary to formulate federal common law, the three-part test established in *United States v. Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), determines whether federal common law is appropriate. *Kimbell Foods* requires a court to decide (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. 1448. After the Ninth Circuit revisited these three factors with the benefit of *O'Melveny* and *Atherton*, it concluded that it had erred in fashioning federal common law to resolve CERCLA successor liability claims. *See Atchison*, 132 F.3d at 1300–01 (noting that state law is largely uniform and that there is no reason to think that a state will change its law to become a haven for liable companies).

Here the district court decided that federal common law applied to the dispute between Salomon and North Shore Gas. On appeal, both parties have neglected to brief the issue and seemingly assume that federal common law applies. Although we recognize that we have "the independent power to identify and apply the proper construction of governing law," *Kamen v. Kemper Fin. Servs., Inc.*, 500

U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), we think it prudent to reserve the choice-of-law question until we are confronted with a case in which the parties have argued the issue. *Cf. Bestfoods*, —— U.S. at —————— n. 9, 118 S.Ct. at 1885–86 n. 9 (declining to decide whether federal common law or state law applies to corporate veil piercing under CERCLA). Accordingly, like North Shore Gas and Salomon, we approach this case on the assumption that federal common law supplies the rule of decision. *See Sharpe v. Jefferson Distrib. Co.*, 148 F.3d 676, 677–78 (7th Cir.1998).

IV. The Potential Successor Liability of North Shore Gas

■ The intuitive response to the question of North Shore Gas' liability might be that as a result of the 1941 Plan, North Continent Utilities—not North Shore Gas—received Old Shattuck and North Continent Mines, and that therefore any liability should succeed to North Continent Utilities. But remember that we are assuming that the Coke Company incurred direct CERCLA liability as a result of its activities with respect to Old Shattuck and North Continent Mines. Thus the question that we address in the following discussion is *not* whether North Shore Gas incurred responsibility for the liabilities of Old Shattuck and North Continent Mines, but instead whether North Shore Gas succeeded to the *direct* liabilities of the Coke Company. As we explain, the answer to this question is yes. On remand, of course, the district court will have to explore whether such direct liability actually exists.

■ The general rule is that an asset purchaser such as the Gas Company does not acquire the liabilities of the seller. There are, however, four exceptions to this general rule: (1) the purchaser expressly or impliedly agrees to assume the liabilities; (2) the transaction is a de facto merger or consolidation; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is an effort to fraudulently escape liability. *See, e.g., Betkoski*, 99 F.3d at 519; *Carolina Transformer*, 978 F.2d at 838; *Vernon v. Schuster*, 179 Ill.2d 338, 228 Ill.Dec. 195, 688 N.E.2d 1172, 1175–76 (1997). Salomon ar-

gues that North Shore Gas is liable under the first, second and third exceptions. The district court, however, decided that none of these exceptions applied and granted summary judgment to North Shore Gas. We review this decision de novo. *See National Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265 (7th Cir.1996) (reviewing grant of summary judgment where district court applied the equitable doctrines of successor liability and piercing the corporate veil).

■ The successor liability doctrine serves the purpose of identifying transactions where the essential and relevant characteristics of the selling corporation survive the asset sale, and it is therefore equitable to charge the purchaser with the seller's liabilities. This overall purpose has particular import for an asset sale such as this one, which was undertaken pursuant to the Holding Company Act and essentially reorganized what "represent[ed] a single business enterprise," *see* Duff & Phelps Rep. at 114. In this situation, identity between what entered the transaction and what emerged from it is much more likely than in an asset sale between strangers. *Cf. Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424 (7th Cir. 1993) ("If, however, the 'sale' is simply a corporate reorganization that leaves real ownership unchanged, the liabilities go with the assets."); *see also Tasemkin*, 59 F.3d at 49. Stated slightly differently, when an asset purchase is more properly described as a reorganization, the "purchaser" will find it difficult to escape liability, because one or more of the successor liability exceptions will suggest that the seller has survived the sale. As will become apparent, here the transaction between the Coke and Gas Companies effectuated some changes—most obviously the conveyance of the Denver properties to North Continent Utilities. None of these changes, however, diminished the essential identity between what entered and what emerged from the 1941 Plan—a gas utility corporation serving the Waukegan area and controlled by North Continent Utilities and the Baehr family.

■ Turning to the exceptions themselves, we agree with the district court that

the Gas Company did not agree to assume the Coke Company's direct CERCLA liabilities. It is well-established that state law determines the rules of contract interpretation, even in the context of CERCLA. *See John Boyd*, 992 F.2d at 406 (collecting cases); *see also LaSalle Nat'l Trust v. ECM Motor Co.*, 76 F.3d at 140, 144 (7th Cir.1996); *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 621 (7th Cir.1995). Illinois law requires the court to give effect to the parties' intent at the time the agreement was made. *See LaSalle*, 76 F.3d at 144. If the terms of the contract are unclear, the court must ascertain the parties' intent solely from the contract itself. If the terms of the contract are ambiguous, however, "the resolution of the ambiguity becomes a question of fact, to be decided by the trier of fact." *See id.* at 144–45.

■ Here we can probably ascertain the intent of the Gas and Coke Companies from the terms of the 1941 Plan alone. While a contract may contemplate CERCLA liability even if it was drafted before passage of the statute, *see Kerr–McGee Chemical v. Lefton Iron & Metal Co.*, 14 F.3d 321, 327 (7th Cir.1994), parties also may structure agreements so as not to touch upon such liabilities, *see John Boyd*, 992 F.2d at 406–07; *cf. South Bend Lathe, Inc. v. Amsted Indus., Inc.*, 925 F.2d 1043, 1044 (7th Cir.1991). The 1941 Plan provided that the Gas Company "shall take said business, properties and contract and other rights subject to all liens, claims, and charges thereon, and *shall assume liabilities and obligations of every kind and character* (other than the Debentures and interest thereon, hereinafter mentioned) of the [Coke] Company *accrued to or existing on the date of transfer*." Plan at § 8 (em-

phasis added). The use of the word "existing" "fairly obviously forecloses the possibility that [the purchaser] agreed to assume any contingent liabilities, much less the environmental liabilities at issue here." *John Boyd*, 992 F.2d at 407; *cf. Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1052 (8th Cir.1996). As for the use of "accrued to," Black's Law Dictionary states that it means "due and payable; vested." *Black's Law Dictionary* 20 (6th ed.1990). Merriam Webster's defines "accrue" as "to come into existence as a legally enforceable claim." *Merriam Webster's Collegiate Dictionary* 8 (10th ed.1994). The plain language of the 1941 Plan thus suggests that the Gas Company did not intend to assume the liability at issue here.[5] And even if the coupling of "accrued to" and "existing" creates ambiguity about whether the parties intended the terms to have different meanings, the district judge rightly determined that the extrinsic evidence demonstrates that the Gas Company did not intend to assume the sort of liability created by CERCLA. *See North Shore Gas Co. v. Salomon, Inc.*, 963 F.Supp. 694, 701–02 (N.D.Ill.1997).

■ With respect to the de facto merger exception, although the approach of the district court is understandable, we think an analysis giving more weight to the two statutes that form the backdrop of this case—the Holding Company Act and CERCLA—is in order. As the district court recognized, two of the requirements for a de facto merger are that "there is a continuation of the enterprise of the seller in terms of ... management, personnel, physical location, assets and operations" and that "the purchasing corporation assumes the obligations of the seller necessary for uninterrupted continuation of business operations."[6] *Louisiana–Pacific*,

**5.** Salomon seeks to discount the significance of "accrued to or existing on" by relying on *GNB Battery*, which held that the phrase "[the purchaser] shall assume ... liabilities of any nature ... incurred by [the seller] prior to the effective date [of the contract]" did not exclude CERCLA liabilities. *See* 65 F.3d at 622, 623. *GNB*, however, is distinguishable from the case at bar. Unlike the 1941 Plan, the contract in *GNB* stated that the purchaser would assume liabilities of any nature "whether accrued, absolute, contingent or otherwise." *Id.* at 623. To hold that that contract excluded CERCLA liabilities would

have therefore "eviscerated" many terms in the agreement. *See id.* at 623–24.

**6.** The other two requirements of a de facto merger are that (1) there is a continuity of shareholders which results from the purchaser paying for the assets with its own shares of stock and (2) the seller ceases operations and dissolves as soon as possible. *See Louisiana–Pacific*, 909 F.2d at 1264. These factors are clearly satisfied here. The Coke Company sold its assets in exchange for 57,041 new common shares of the Gas Company. Plan at § 8. And the Plan provided that

909 F.2d at 1264. The Holding Company Act—one of the primary reasons the companies entered into the Plan—sought to "limit the operations of holding compan[ies] ... to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system." 15 U.S.C. § 79k(b)(1). The Gas Company therefore did not assume (and could not assume) the Coke Company's nonutility assets—Old Shattuck and North Continent Mines.[7] Thus, taking a narrow view, the de facto merger exception might not be available because a federal statute, the Holding Company Act, required divestment of the mining businesses. Or, put slightly differently, compliance with the Holding Company Act might effectively defeat CERCLA liability, since the Holding Company Act requires the divestment that may make the de facto merger exception inapplicable. This result would be unsatisfactory for two reasons.

The first relates to what actually happened as a result of the 1941 Plan. If we abandon a "slavish adherence to multi-factor tests"—as North Shore Gas actually encourages us to do, see Appellee's Br. at 31—the transaction between the Coke and Gas Companies strongly resembles a de facto merger. Before the 1941 Plan, the Coke and Gas Companies were in effect two divisions of the same utility business. See Duff and Phelps Rep. at 114 (the two companies "[b]roadly speaking ... represent[ed] a single business enterprise."). After the Plan, the Coke and Gas Companies became a vertically integrated public utility system in form as well as in fact, with the Gas Company continuing all of the Coke Company's utility-related operations. In literal terms, this means that what was formerly the Coke Company continued to manufacture gas and coke for the Gas Company, and that the Gas Company continued to distribute gas in the Waukegan area.

And this continuation of the status quo is unsurprising, since the 1941 Plan was widely viewed as a merger of the Gas and Coke Companies. See, e.g., id. at 113, 116 ("As the first step in meeting [the financial problems posed by the joint bonds], we concur in the recommendation that the two properties be merged into a single company under a single capital structure.... There are other advantages such as simplification of executive control and increased efficiency in the use of personnel."). Of course, in light of the Holding Company Act, the SEC would not have approved the merger if the Coke Company had continued to hold its non-utility assets. Given the necessity of compliance with the Act, it may be reasonable to view the transfer of Old Shattuck and North Continent Mines to North Continent Utilities as merely the preliminary step in the de facto merger between the Coke and Gas Companies.

CERCLA itself is the second reason why a straightforward de facto merger analysis is unsatisfactory. North Shore Gas asserts that a "de facto merger between [the Gas Company] and [the Coke Company's] *utility operations* would not render North Shore Gas liable for liabilities relating to the ... *non-utility* operations [of the 'dirty' businesses]." See Appellee's Br. at 33. But this contention runs contrary to CERCLA, which generally prohibits a party from transferring away its direct liabilities. See, e.g., Harley–Davidson, 41 F.3d at 342, 343. If we were to conclude that there were no de facto merger solely because the Coke Company transferred Old Shattuck and North Continent Mines to North Continent Utilities—and that hence the Gas Company could not succeed to the Coke Company's direct liabilities—we would essentially allow the Coke Company to circumvent CERCLA's prohibition on the transfer of direct liability.

 Because we are also able to find the Gas Company responsible for the Coke Com-

---

the Coke Company was to be liquidated "as soon as may be conveniently done." Plan at § 10.

**7.** At oral argument, the parties were unable to explain why the SEC allowed the Coke Company to transfer Old Shattuck and North Continent Mines to North Continent Utilities, when the end result was that North Continent Utilities contin-

ued to hold utility and non-utility assets. However, the record shows that not later than 1944, North Continent Utilities was liquidating pursuant to the Holding Company Act. See 1944 Annual Report for North Continent Utilities Corporation.

pany's CERCLA liabilities under the mere continuation exception, we will not pursue at further length the complexities surrounding the de facto merger issue. We believe, however, that in the context of a Holding Company Act reorganization and CERCLA, the policy of the de facto merger exception must find application here. In addition, our overall analysis is strongly buttressed by the fact that the Gas Company continued all the utility aspects of the Coke Company's operations. As our discussion about the mere continuation exception will make clear, that doctrine is not a perfect fit for the circumstances of this particular case. If the case for de facto merger were not so strong, our approach to the mere continuation exception might be different. In a sense, then, our analysis is a hybrid,[8] in which we rely on both the rationale for the de facto merger exception and on the underlying basis of the mere continuation exception as well.

■ As we have already alluded, the facts of this case tip in favor of applying the mere continuation exception, especially in light of equitable considerations. The mere continuation exception allows recovery when the purchasing corporation is substantially the same as the selling corporation. *See* Fletcher, *Cyclopedia of the Law of Private Corporations* § 7124.10 (perm. ed.1990). The exception therefore applies when "the purchasing corporation maintains the same or similar management and ownership but wears a 'new hat.'" *Id.* (footnote omitted). Accordingly, the inquiry focuses on whether the purchaser continues the *corporate entity* of the seller, not so much on whether the purchaser continues the *business operations* of the seller (although, as we have pointed out, here the gas utility operations were in fact continuous). Courts have identified a

number of factors that suggest that the seller's corporate entity has continued on after the sale of assets. These factors include "an identity of officers, directors, and stock between the selling and purchasing corporations," *Mexico Feed*, 980 F.2d at 487 (internal quotation marks and citations omitted); *see Carolina Transformer*, 978 F.2d at 838; *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir.1977), as well as a continuity of ownership and control, *see General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir.1997). Courts also consider whether only one corporation exists after the transfer of assets, *see Carolina Transformer*, 978 F.2d at 838; *Travis*, 565 F.2d at 447, and whether the purchaser paid adequate consideration for the assets, *see Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 812 F.Supp. 124, 129 (N.D.Ill.1993).

■ Under federal common law no single factor is supposed to be determinative; instead, courts take a common-sense approach when deciding whether the seller's corporate entity has continued after the sale of assets. *See* Fletcher, *supra*, at § 7124.10; *see also HRW Sys., Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 330 (D.Md.1993). This warrants emphasis, since there is a tendency to proceed as if each factor is always as significant as the others, regardless of the unique circumstances of a particular case. But not all corporations are created equal. And depending on the character of the corporations involved in the asset purchase, a factor that appears on the mere continuation laundry list may be utterly unilluminating about the true effect of the asset purchase. The mere continuation exception requires close scrutiny of corporate realities, not mechanical application of a multi-factor test.

---

8. In some ways, our analysis touches upon the "substantial continuity" exception to the general rule that asset purchasers do not acquire the liabilities of the seller. This fifth exception—which is not as widely accepted as the four others that we outlined—considers:

an identity of stock, stockholders, and officers, but not determinatively. It also considers whether the purchasers retained the same facilities, same employees, same name, same production facilities in the same location, same supervisory personnel; and produced the same product; maintained a continuity of assets;

continued the same general business operations; and held itself out to the public as a continuation of the previous enterprise.

*Mexico Feed*, 980 F.2d at 488 n. 10. The exception also requires that the purchaser have knowledge of the seller's wrongdoing. *See id.* at 488. Because Salomon did not raise the substantial continuity exception in the district court, it waived the argument that the exception applies here. Accordingly, we have not explored this exception or decided whether it too would be applicable here.

*Cf. Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.App.3d 241, 214 Ill.Dec. 1029, 662 N.E.2d 595, 600 (1996) (finding, in light of the "unique" facts of the case, a continuity of shareholders between the purchasing and selling corporations "even though the shareholders were different in each corporation.").

In this case, continuity of ownership and control is the linchpin of our conclusion that the Coke Company merely continued on in the Gas Company after implementation of the 1941 Plan. Recall the pivotal role of North Continent Utilities (and its founder, William Baehr). Prior to the Plan, North Continent Utilities owned more than 99% of the Coke Company's common stock and 91.47% of its preferred stock; it also controlled 100% of the Gas Company's common stock and 2.28% of its preferred stock. Because North Continent Utilities (a Baehr family vehicle) owned the vast majority of stock, it called the shots with respect to the activities of the Gas and Coke Companies. After the 1941 Plan—which reduced claims on the Gas Company's earnings by eliminating preferred stock from the Gas Company's capital structure and substituting common stock for the non-Baehr interest—North Continent Utilities owned slightly more than 35% of the Gas Company's common stock. The former owners of the Gas Company's preferred stock (the public) owned the remaining 65%. A crude assessment of the numbers might suggest to the financially untutored that North Continent Utilities suffered a precipitous loss of control over both the Gas Company and the assets that formerly belonged to the Coke Company. But the decline in the percentage of common stock owned by North Continent Utilities is, of course, deceptive. No other single entity or individual owned a percentage of the Gas Company's common stock that came close to rivaling that of North Continent Utilities. Thus, as the Securities and Exchange Commission noted after reviewing the effects of the 1941 Plan, the 35% share was "[f]or all practical purposes ... sufficient to insure control of the Gas Company ... by North Continent and Baehr." SEC Report at 4.

Given the context in which the Plan was negotiated, the retention of control by North Continent Utilities and Baehr is unsurprising. The Holding Company Act was primarily concerned with removing non-utility investments from the utility system—thereby ensuring that the properties and businesses "of every registered holding company and subsidiary company thereof" were "confined to those necessary or appropriate to the operations of an integrated public utility system." 15 U.S.C. § 79k(a). North Continent Utilities could continue to hold the reins of the Gas Company and the (former) Coke Company, so long as the Coke Company got rid of Old Shattuck and North Continent Mines—its two non-utility businesses. And although the preferred shareholders had various mismanagement claims against Baehr, there is no indication that they sought to wrest control away from him. In sum, the need for compliance with the Holding Company Act, the refunding of the joint bonds, and the abatement of the claims of the preferred shareholders led North Continent Utilities (Baehr) to pursue a restructuring of the Gas and Coke Companies, but these factors by no means required a relinquishment of control. In the aftermath of the 1941 Plan, North Continent Utilities was in a position similar to the one it occupied before the advent of the Plan: it owned a dominant portion of common stock and thereby exercised control over both the Coke Company's (former) assets and the Gas Company.

Because North Continent and Baehr remained in control after the 1941 Plan, the next factor that the case law identifies as important—an identity of officers and directors between the selling and purchasing corporations—declines in significance. In evaluating this factor, courts traditionally look to the number of officers and directors from the selling corporation who serve on the board of the purchasing corporation after the sale of assets. *See, e.g., HRW*, 823 F.Supp. at 332. But this is not always the most appropriate inquiry. When there is an identity of ownership and control, the relevant question may be whether the controlling entity has the power to install responsive and compliant officers and directors at the helm of the purchasing corporation—not whether the controlling interest has in fact installed the *same* adherents who steered the selling

corporation. Here, for example, the 1941 Plan provided that the Gas Company's preferred shareholders would elect five individuals to serve on the post–1941 board of directors, and that North Continent Utilities would elect four. This board would be in place only until early 1943, however, at which time North Continent Utilities (with 35% of the Gas Company's stock) would be "insure[d] control" of the board because shareholders had the right to cumulate their votes in elections for directors. *See* SEC Report at 4; Plan at § 19. We can assume, of course, that North Continent would, or could if circumstances demanded, install a majority of directors that were attentive to its interests. Whether these were the same directors that had served at the board of the Coke Company seems less probative of corporate identity—the important point is that both the old directors of the Coke Company and the new directors of the Gas Company were subject to the marching orders of North Continent Utilities and Baehr.

But even if the post-Plan Gas Company were not controlled by North Continent Utilities and Baehr and we looked to its officers and directors as personalities in their own right, we could find an identity between the post–1941 Gas Company and the Coke Company. North Shore Gas emphasizes that before the 1941 Plan, five of the Coke Company's nine officers and directors were on the board of the Gas Company; while after the Plan, only two of the Coke Company's officers and directors assumed roles on the nine-member board of the Gas Company. Appellee's Br. at 36.[9] The mere continuation exception does not require "mathematical precision," *see HRW*, 823 F.Supp. at 331; so a superficial inquiry might focus on whether it is sufficient that only two of the seller's nine directors ended up on the purchaser's board. But we are interested in corporate realities, and here this inquiry would mean missing the forest for the trees. Prior to its sale of assets, the Coke Company had nine officers and directors. After implementation of the 1941 Plan, two of these individuals served on the board of the post–1941 Gas Company. And six of the officers and directors of the Coke Company became or continued on as officers and directors of North Continent Utilities. (One of these individuals was on the boards of both the post-Plan Gas Company and North Continent Utilities.) Because North Continent Utilities controlled the post–1941 Gas Company, the practical and immediate effect of the 1941 Plan was that seven of the nine directors of the defunct Coke Company became influential in the affairs of the rejuvenated Gas Company (one via the board of the Gas Company, five via the board of North Continent Utilities and one via the boards of the Gas Company and North Continent Utilities).[10] Under this

9. The Letter of Reorganization, which we rely on in footnotes 1 and 10, indicates that prior to the 1941 Plan, *six* members of the nine-member board of the Coke Company were also on the board of the Gas Company. Admittedly, this only bolsters the point that North Shore Gas is trying to make—the officers and directors of the Coke Company had more influence over the Gas Company before than after implementation of the 1941 Plan.

10. After the 1941 Plan, the officers and directors of the Gas Company and North Continent Utilities had the following relationship to the officers and directors of the liquidated Coke Company:

| Coke Company (pre-Plan) | Gas Company (post-Plan) | North Continent Utilities (post–Plan) |
|---|---|---|
| G.L. Aiken | | G.L. Aiken |
| | J.L. Allen* | |
| | | J.C. Aspley |
| W.A. Baehr | | |
| W.B. Baehr | | W.B. Baehr |
| | L.M.G. Bouscaren | |
| A.W. Childs | | A.W. Childs |
| A.J. Faul | | A.J. Faul |
| A.V. Foster | | A.V. Foster |
| | J.O. Guthrie* | |
| W.P. Hendricks | | |
| | J.L. Martin* | |

more—although not wholly—traditional numbers analysis, we conclude that although there was some variation between the officers and directors of the post–1941 Gas Company and the Coke Company, the "essential character [was] the same." *Id.*

The other factors emphasized by the case law warrant less discussion. Although neither party argues the point, there was identity of stock after the sale of the assets because holders of the Coke Company's preferred stock received common shares (the sole surviving class of equity securities) of the post-Plan Gas Company. There was also only one corporation after the purchase of assets; as we have already stated, the 1941 Plan specified that the Coke Company was to be liquidated "as soon as may be conveniently done." Plan at § 10; *cf. Travis*, 565 F.2d at 447.

We note, as North Shore Gas argues, that there is no evidence that the Gas Company paid inadequate consideration for the Coke Company's assets. But given the circumstances of this particular case, the amount of consideration is not strongly probative of whether the Coke Company's corporate entity continued on after the sale of assets. Presumably courts look to consideration to help determine whether a sale of assets was a genuine transaction between the purchasing and selling corporations, and not a mere change of garb. Here, the negotiations were between a committee representing the preferred shareholders in the Gas Company, North Continent Utilities (the owner of the Coke Company as well as the Gas Company's common stock) and the bondholders. Plan at § 3. It was these interests that determined how many shares of the Gas Company the Coke Company would receive in exchange for its assets. But regardless of the legitimacy of these negotiations, the bulk of the evidence suggests that the 1941 Plan only served to update the wardrobe of the Gas and Coke Companies. Prior to the Plan, the companies had virtually identical boards of directors and both were controlled by North Continent and Baehr; after the Plan, North Continent and Baehr maintained control. And throughout it all, the Gas Company and the assets that constituted the Coke Company continued to supply gas to the Waukegan area. In the face of these corporate realities, adequacy of consideration should not be determinative.

Finally, because successor liability is an equitable doctrine that should not apply "unless justified by the facts," *Carolina Transformer*, 978 F.2d at 837, we say a word or two about the equities of this case (which we regard as the crucial and decisive element of our analysis). North Shore Gas argues vigorously that before and after the 1941 Plan, it neither contributed to nor profited from the contamination at the Denver Site. But this argument ignores the close relationship between the Gas and Coke Companies and several facts about their shared history. This is not a case in which we are holding an arms-length purchaser responsible for the environmental sins of its supplier. Indeed, it is unsurprising that a consultant's report refers to the companies as the "North Shore System" and a "single business enterprise." Duff & Phelps Rep. at 62, 114. Even beyond the dominance of North Continent Utilities and Baehr—which we have discussed at length—evidence of the symbiosis between the two companies abounds. To cite just a few examples, beginning in 1935, "the average price charged to the Gas Company ... [was] considerably below what this company would have [had] to pay for coke in the open market." *Id.* at 63. And as a result of the

| | W. Remy* | O. Simpson |
|---|---|---|
| | P.P. Stathas | F.H. Stowell |
| J.W. Sykes | J.W. Sykes | |
| | J.S. Whyte* | |
| A.C. Winters | A.C. Winters | A.C. Winters |

*See* Letter Transmitting Plan of Reorganization, 11/11/41; 1943 Annual Report for North Continent Utilities Corporation. With respect to the Gas Company, asterisks indicate officers and directors who were elected by the former preferred shareholders to serve until April 1943. The other individuals were selected by North Continent Utilities.

supply contract and the joint bonds, the Gas Company was "as concerned with the solvency of the [Coke Company] as it [was] with its own." *Id.* at 114. Even the initial foray into the mining business was connected to the Gas Company, since the Coke Company's original intention was to treat the ore produced by North Continent Mines with ammonium sulphate, a by-product of the Waukegan coke plant—in other words, a by-product created in the manufacture of products for the Gas Company. *See id.* at 47. Given this serendipity, it seems that to the extent that the Coke Company benefitted from involvement in the mining industry, the Gas Company benefitted as well.

Finally, to return to our theme of corporate realities, we emphasize that while the 1941 Plan was formally an asset purchase, it is not mere happenstance that the Plan was labeled a "Plan of Reorganization," or that the daily utility operations of the "North Shore System" were largely unaffected by the 1941 Plan. North Continent Utilities and Baehr agreed to the 1941 Plan as a means of addressing a number of developing hot spots: non-compliance with the Holding Company Act, the maturing joint bonds and the disgruntled preferred shareholders of the Gas Company. But North Continent Utilities and Baehr also sought and managed to retain their control over the North Shore system. Thus the attraction of the 1941 Plan was that it "shuffled the deck," but allowed the players and their game to remain the same. We fail to see why a plan of reorganization—undertaken only to ensure compliance with the Holding Company Act and to resolve other structural and financial issues—should act as a firewall that effectively extinguishes the Coke Company's direct CERCLA liability. *Cf. Chaveriat,* 11 F.3d 1420, 1424 (7th Cir.1993). As we have explained, this conclusion is buttressed by the de facto merger analysis, which also points to successor liability. It accordingly strikes us as equitable to hold the Gas Company accountable for the Coke Company's direct CERCLA liability—assuming that such liability exists. Were

this not the case, another outcome might be justified.

To conclude, we note that one of North Shore Gas' main defenses throughout is that, since the mining businesses were severed from the utility operations pursuant to the Holding Company Act, environmental liability should attach to North Continent Utilities instead of North Shore Gas. But, as we have tried to emphasize, the shedding of direct environmental liability is not a matter entirely within the control of the party seeking to hand off (or avoid) liability. And to allow direct liability to be conveyed away under the circumstances of this case would violate CERCLA's clear policy that once direct liability attaches, it cannot be cast off through the mere transfer of property.

In any event, we leave to the district court the task of determining whether the Coke Company incurred direct CERCLA liability from its activities relating to Old Shattuck and North Continent Mines.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.