UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NATIONAL AMERICAN INSURANCE
COMPANY; GULF INSURANCE
COMPANY,

*Plaintiffs-Appellants,*

v.

RUPPERT LANDSCAPING COMPANY,
INCORPORATED,

*Defendant-Appellee.*

No. 01-1468

NATIONAL AMERICAN INSURANCE
COMPANY; GULF INSURANCE
COMPANY,

*Plaintiffs-Appellees,*

v.

RUPPERT LANDSCAPING COMPANY,
INCORPORATED,

*Defendant-Appellant.*

No. 01-1510

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge;
James C. Cacheris, Senior District Judge.
(CA-00-1258-A)

Argued: October 31, 2001

Decided: December 26, 2001

Before WILKINSON, Chief Judge, and WIDENER and
GREGORY, Circuit Judges.

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Chief Judge Wilkinson and Judge Widener joined.

## COUNSEL

**ARGUED:** Dawn C. Stewart, HENRICHSEN SIEGEL, P.L.L.C., Washington, D.C., for Appellants. C. Thomas Brown, SILVER & BROWN, P.C., Fairfax, Virginia, for Appellee. **ON BRIEF:** Neil L. Henrichsen, HENRICHSEN SIEGEL, P.L.L.C., Washington, D.C., for Appellants. Glenn H. Silver, SILVER & BROWN, P.C., Fairfax, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

GREGORY, Circuit Judge:

National American Insurance Company and Gulf Insurance Company (collectively "the Sureties") filed this action against Ruppert Landscaping Company ("RLC"), claiming that RLC was liable for certain debts incurred by Green Thumb Landscape Company ("Green Thumb") upon RLC's acquisition of Green Thumb's assets. After three days of trial, the district court entered judgment for RLC, rejecting the Sureties' successor liability and fraudulent conveyance claims. We affirm.

### I.

Green Thumb[1] and RLC provided landscape maintenance and landscape installation services in the Washington D.C. area for approxi-

---

[1]Green Thumb is not a party to this action.

mately 20 years. In 1995, however, Green Thumb experienced financial difficulties that led it to default on certain obligations. Significantly, it defaulted on performance bonds acquired for several of its landscape installation contracts through the Sureties. National American and Gulf Insurance incurred losses of $640,729 and $1,905,904.95, respectively, as a result of Green Thumb's default.

Upon learning of Green Thumb's financial difficulties, RLC negotiated to acquire Green Thumb's assets. On July 31, 1995, RLC and Green Thumb signed a Purchase Agreement, under which Green Thumb agreed to transfer to RLC its vehicles, equipment, and maintenance contracts "free and clear of any liens and encumbrances." J.A. 2026, 2027. Recognizing that Green Thumb had liens on many of these assets, the Purchase Agreement allowed Green Thumb to use the "sales proceeds [of the Green Thumb/RLC transaction] to obtain releases of liens in order to convey good title[.]" J.A. 2040.[2]

Green Thumb, in fact, had a mounting debt problem. A June 1995 Dunn & Bradstreet report downgraded Green Thumb's credit rating from "good" to "fair." The report showed that Green Thumb was party to four pieces of litigation seeking $103,523, and that state and federal taxing authorities had liens against Green Thumb totaling $675,000. Moreover, Green Thumb owed NationsBank approximately $1,523,695.86 on three loans (a line of credit loan, an equipment loan, and a real estate loan). As a result of this debt, NationsBank held liens on much of Green Thumb's maintenance contracts, vehicles and equipment.

It appears that RLC knew Green Thumb could not meet at least some of its obligations. RLC questioned Green Thumb's internal balance sheets and projected income/expense analyses. Additionally,

---

[2]The Purchase Agreement further required RLC to pay Green Thumb a "Base Purchase Price" of $1,564,000 either (1) at closing, or (2) the earlier of (a) the date on which title to any item of equipment could be validly conveyed free of all liens and encumbrances, or (b) August 31, 1995. J.A. 2027-28. RLC also pledged to pay ten percent of gross receipts from the maintenance contracts in four annual installments. However, RLC could set off any amounts due Green Thumb against any amounts Green Thumb owed RLC.

RLC's Chief Financial Officer, Ken Hochkeppel, noted that it appeared Green Thumb could become insolvent.

RLC sought to insulate itself from Green Thumb's debt in several ways. First, the Purchase Agreement explicitly stated that RLC would "not assum[e] any debts, liabilities, agreements, contracts or obligations" of Green Thumb, other than those directly related to its asset purchase. J.A. 2036. Second, RLC employees helped Green Thumb obtain releases of various leases and liens relating to the assets RLC sought to purchase, with RLC signing some of the releases itself. Third, RLC purchased from NationsBank two Green Thumb notes that encumbered many of the assets it sought to purchase. RLC bought the notes for $960,000. RLC and Green Thumb then entered into a Forbearance Agreement related to the NationsBank notes under which Green Thumb agreed to immediately pay RLC $192,595.86, and pay RLC all the interest on its line of credit loan plus $125,000 monthly from September 5, 1995 through December 1995. Beginning January 1996, the principal payments would be reduced to $100,000 monthly.

Upon completing the sale, RLC hired approximately 100 Green Thumb employees, virtually all from Green Thumb's landscape maintenance division. Additionally, once before the sale's completion and twice afterward, RLC transferred funds totaling $25,151.56 to Green Thumb so that Green Thumb could meet payroll obligations. Finally, on July 27, 1995 — shortly before the parties signed the Purchase Agreement — Green Thumb sent a letter to some of its clients, stating that "Green Thumb and [RLC] are combining landscape/maintenance operations under the umbrella of [RLC]." J.A. 1595. The letter stated that Green Thumb was "very excited about what this alliance can offer us all" and referred to the Green Thumb-RLC transaction as a "merging of our two operations." J.A. 1595. RLC approved the letter before Green Thumb mailed it to its clients.

The Sureties filed this action against RLC on July 27, 2000, making claims of successor liability and fraudulent conveyance. On March 13, 2001, the parties began three days of trial, at the end of which the Sureties completed their case-in-chief. The district court then granted RLC's Fed. R. Civ. P. 50 motion for judgment as a matter of law on the Sureties' successor liability claim, and entered judg-

ment under Rule 52 against the Sureties on their Va. Code § 55-80 fraudulent conveyance claim. After the entry of judgment, RLC moved for sanctions against the Sureties under Fed. R. Civ. P. 11. RLC argued that the Sureties "pursued [RLC] through a chain of actions without uncovering new evidence and without any good faith basis in fact or law." J.A. 3624-25 (internal quotation marks omitted). The Court rejected the motion, holding that RLC failed to comply with Rule 11's 21-day safe harbor provision. J.A. 3625. Additionally, the court held that the Sureties' claims "were not devoid of factual and legal foundation." J.A. 3627.

## II.

### A.

We review *de novo* the district court's decision to grant RLC's Rule 50 motion. *Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 888 (4th Cir. 1992). Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)). The Court should review all the evidence in the record, but "draw all reasonable inferences in favor of the nonmoving party." *Id.* at 150 (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990)). Additionally, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2nd ed. 1995)).

We review the district court's Rule 52 ruling entering judgment against the Sureties' fraudulent conveyance claim under the clearly erroneous standard. Fed. R. Civ. P. 52(a); *Holmes v. Bevilacqua*, 794 F.2d 142, 147 (4th Cir. 1986) (*en banc*). We will reverse the district court's findings only if its ultimate determinations "were induced by an erroneous view of the controlling legal standard; or are not supported by substantial evidence; or were made without properly taking

into account substantial evidence to the contrary or are against the clear weight of the evidence considered as a whole." *Dwyer v. Smith*, 867 F.2d 184, 187 (4th Cir. 1989) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1104 (4th Cir. 1985)).

B.

It is well settled that "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." *City of Richmond v. Madison Management Group, Inc.*, 918 F.2d 438, 450 (4th Cir. 1990) (quoting 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7122, at 188 (Rev. Perm. Ed 1983)). This general rule of corporate non-liability serves, in effect, "as a security blanket" that "protects corporate successors from unknown or contingent liabilities of their predecessors." *Conway v. White Trucks*, 692 F.Supp. 442 (M.D. Pa. 1988), *aff'd*, 885 F.2d 90 (3d Cir. 1989). The purchasing corporation "is not liable on the other company's obligations merely by reason of its succession to such company's property." 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 7122, at 227 (Perm. Ed 1999) (hereinafter "Fletcher"). However, there are exceptions to this general rule. For example, a purchasing corporation can be liable for the debts and liabilities of a selling corporation if "the purchasing corporation expressly or impliedly agreed to assume such liabilities," or if "the transaction is fraudulent in fact." *Harris v. T.I., Inc.*, 413 S.E.2d 605, 609 (Va. 1992) (citing *Pepper v. Dixie Splint Coal Co.*, 181 S.E. 406, 410 (Va. 1935)).[3] These exceptions to the general rule seek to identify only those transactions "where the essential and relevant characteristics of the selling corporation survive the asset sale," thus rendering it equitable to hold the purchaser liable for the seller's obligations. *North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 651 (7th Cir. 1998).

The Sureties do not, and could not, contend that RLC expressly assumed Green Thumb's liabilities. Indeed, section 8 of the Purchase Agreement explicitly states that RLC does "not assum[e] any debts, liabilities, agreements, contracts or obligations" of Green Thumb, other than those directly related to its asset purchase. J.A. 2036. This

---

[3]All parties agree that Virginia law applies to this suit.

language is clear and unambiguous on its face, heavily weighing against a finding that RLC impliedly assumed Green Thumb's liabilities or that the transaction was fraudulent in fact. *See* Fletcher at 251-52 ("A contract between the seller and purchaser corporations, with explicit provisions which exclude any liability for the debts and liabilities of the predecessor, weighs against finding that an exception can be implied").

Moreover, it is well settled that a court should not resort to extrinsic evidence to interpret a contract when the contract's language is plain and unambiguous. *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). A court must give plain and unambiguous contract language its "legal effect according to [its] plain, ordinary and popular meaning." *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 (10th Cir. 1989). Here, the plain and unambiguous language of the Purchase Agreement states that RLC would not assume the liabilities of Green Thumb. Its language could not be any plainer or less ambiguous. Such express language weighs heavily against any finding of an implied assumption of liabilities or that the transaction was fraudulent in fact.

Nonetheless, the exceptions to the general rule of non-liability allow courts to look outside the four corners of a contract under appropriate circumstances. Such circumstances do not exist here. We have reviewed the Sureties' evidence supporting their theories of successor liability.[4] After reviewing the evidence and drawing all reasonable inferences in the Sureties' favor, *see Reeves*, 530 U.S. at 150, it

---

[4]The same analysis underlying the fraud-in-fact theory of successor liability applies to the Sureties' fraudulent conveyance claim. Both must be analyzed under Va. Code § 55-80, which states that

> [e]very gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, . . . given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, . . . be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

is evident that the Sureties failed to advance sufficient evidence to defeat the general rule of non-liability. The strongest evidence advanced by the Sureties in support of their claim is:

- RLC was aware of Green Thumb's financial difficulties and the extent of its debt.

- RLC employees helped Green Thumb obtain releases on some of its liens.

- RLC paid off, rather than purchased, Green Thumb's debt to NationsBank.

- RLC covered Green Thumb's payroll on three occasions.

- RLC hired 100 Green Thumb employees.

- RLC approved the July 27 letter from Green Thumb to some of its clients, which stated that Green Thumb and RLC were "combining" their operations and forming an "alliance."

First, RLC's awareness of Green Thumb's financial difficulties cannot help the Sureties' case. It should be of no surprise that a company selling assets has financial difficulties. Indeed, it is often the case that a company sells assets precisely because of its financial difficulties. If we were to craft a rule suggesting that a company would assume the liabilities of a financially-strapped company simply by purchasing its assets, we would eviscerate the general and long-standing rule of non-liability, as well as drastically chill future asset purchases.

Second, it is of no moment that RLC employees helped Green Thumb obtain releases on some of its leases and liens. RLC sought to purchase Green Thumb's assets with clear title; it obviously could not do so until Green Thumb obtained the releases. RLC's assistance in doing so does not imply an assumption of liability or a fraudulent act.

Third, there is no evidence that RLC paid off, rather than purchased, Green Thumb's debt to NationsBank. The undisputed evidence was that RLC negotiated the purchase with NationsBank and then entered into a forbearance agreement with Green Thumb. Nothing in the record suggests a pay-off.

Fourth, RLC's decision to cover Green Thumb's payroll on three separate occasions is of little note. Indeed, one may argue that, by doing so, RLC helped Green Thumb remain viable longer than it otherwise would have, thereby giving it greater opportunity to obtain funds with which to pay its debts. And, while it is true that RLC hired 100 Green Thumb employees, it hired only employees who worked on Green Thumb's landscape maintenance contracts, which RLC purchased from Green Thumb. It did not hire employees from Green Thumb's landscape installation business, which Green Thumb retained. Finally, while the July 27 letter is suspect, the Sureties fail to provide any evidence that any creditor relied on the letter to believe that RLC acquired Green Thumb's liabilities.

The Sureties fail to advance sufficient evidence to defeat the general rule of non-liability. Their strongest evidence fails to even suggest that "the essential and relevant characteristics of [Green Thumb] survive[d] the asset sale[.]" *North Shore Gas Co.*, 152 F. 3d at 651. The heavy weight that must be accorded the plain language of the Purchase Agreement simply cannot be circumscribed.

### III.

For the foregoing reasons, the judgment of the district court is affirmed.[5]

*AFFIRMED*

---

[5]We have considered the parties' remaining contentions and find them without merit.