State of NEW YORK and Thomas C. Jorling, Commissioner of the New York State Department of Environmental Conservation, Plaintiffs,

v.

WESTWOOD–SQUIBB PHARMACEUTICAL CO., INC., and National Fuel Gas Distribution Corporation, Defendants.

No. 90–CV–1324C.

United States District Court, W.D. New York.

July 28, 1999.

Buchanan Ingersoll Professional Corporation (Daniel M. Darragh, of counsel), Pittsburgh, PA, for defendant Westwood–Squibb Pharmaceutical Co., Inc.

Phillips, Lytle, Blaine, Hitchcock & Huber (Robert E. Glanville, of counsel), Buffalo, NY, for defendant National Fuel Gas Distribution Corporation.

DECISION and ORDER

CURTIN, District Judge.

## BACKGROUND

On August 12 and 13, 1996, the court held a non-jury trial to determine whether Westwood–Squibb Pharmaceuticals, Inc. ("Westwood"), can recover response costs for the cleanup of an 8.8 acre parcel of property in Buffalo, New York, for which it claims National Fuel Gas Distribution Corporation ("National Fuel")[1] is liable under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.* On September 25, 1997, the court issued its findings of fact and conclusions of law (hereinafter "Order I") and found National Fuel liable "for all operations at the site from 1898 until Westwood purchased the site in 1972." Item 147, at 54.

On October 10, 1997, National Fuel filed a Rule 52(b) motion for an order amending these findings of fact and conclusions of

law or, in the alternative, for an order pursuant to 28 U.S.C. § 1292(b) certifying the interlocutory order for immediate appellate review. Item 148. National Fuel argues "that the factual record and applicable law does [sic] not support the Court's determination that William J. Judge acted as National Fuel Gas Corporation's agent in purchasing and operating certain Buffalo Gas Corporation assets or that Iroquois Gas Corporation is a successor to People's Gas, Light and Coke Company under the de facto merger doctrine." Item 148, at 1.

Westwood opposes National Fuel's motion and maintains that the court could modify Order I to achieve the same results in a more simple and straightforward fashion. Item 151, at 2. Westwood notes that the court did not distinguish operator liability from owner liability in Order I.

The parties have submitted several memoranda of law and letters in support of their positions. They appeared before the court for oral argument on January 23, 1998.

## DISCUSSION

Before discussing National Fuel's challenges and Westwood's suggested modifications to Order I, it is useful to pinpoint the liability actually in dispute. National Fuel admits that it is the corporate successor to both Niagara and Iroquois. Item 145, at 3. Thus, National Fuel has assumed any CERCLA liabilities that might be attributed to: (1) Niagara as operator of the site from October 1, 1921, until Niagara merged into Iroquois in December 1922; (2) Iroquois as operator of the site from 1922 to 1972; and (3) Iroquois as owner of the site from November 25, 1925, until it was sold to Westwood in 1972. Thus, National Fuel admits that it: (1) owned the site after November 25, 1925; and (2) operated the site after October 1, 1921.

---

1. National Fuel is a subsidiary of National Fuel Gas Corporation ("NFGC"). NFGC was organized as a holding company in 1902, and it is the company that figures prominently in the history of this case. National Fuel has stipulated that it will be responsible for any liability attributed to NFGC.

With this in mind, Westwood seeks to establish that National Fuel is also liable under CERCLA: (1) as a successor to the owner of the site from 1898 to 1925; (2) as a successor to the operator of the site from 1898 to 1901; and (3) as an operator of the site from 1917 to 1921. Item 151, at 3. Westwood does not contend that National Fuel is liable from 1901 to 1917 as a successor to BGC or the Receivers who operated the site. Item 151, at 3. As such, Westwood concedes that there is an "orphan share" of operator liability from 1901 until 1917 that the parties will have to address during the allocation phase of this litigation. Item 156, at 25. National Fuel vigorously argues that it is not liable under CERCLA, either as a successor to the owner of the site before 1925 or as a successor to the operators or operator of the site before 1921.

In Order I, the court found that William Judge, an officer of National Fuel Gas Corporation ("NFGC"), acted as an agent for NFGC when he purchased the BGC assets in 1917 and operated those assets from 1917 until 1921. Item 147, at 22–37. The court also found that there was a de facto merger between BGC and Niagara in 1921. The court found that Iroquois succeeded to the liabilities of People's Gas, Light & Coke Company ("People's") through a complicated series of transactions starting with BGC's acquisition of People's stock and bonds in 1899, and culminating in the November 25, 1925, foreclosure sale of People's bonds to Iroquois. Item 147, at 41–54.

After reading the briefs and hearing the arguments, the court recognizes that it erred in Order I by not distinguishing CERCLA liability as an owner from CERCLA liability as an operator. Furthermore, the court admits that it erred in finding a de facto merger between BGC and Niagara in 1921.[2] The court agrees with Westwood that it is not necessary to find a merger of BGC into Niagara in order to find that Iroquois succeeded to People's CERCLA liability ·as an owner under section 107(a)(2) of CERCLA. Item 151, at 30. Accordingly, the court amends Order I by addressing the ownership history of the site separately from the operations history of the site. In addition, the court corrects certain errors in Order I; however, these errors are not dispositive to the court's analysis.[3]

## I. National Fuel's Liability as an Owner of the Site from 1898 until 1925

CERCLA holds liable for response costs "any person who at the time of disposal of any hazardous substance *owned or operated* any facility at which such hazardous substances were disposed of" if "there is a release, or a threatened release ... of a hazardous substance" from the facility. 42 U.S.C. § 9607(a)(2) (emphasis added); 42 U.S.C. § 9607(a)(4). Thus, CERCLA liability based on ownership of the site is distinct from CERCLA liability based on operation of the site.

2. Westwood notes in its post-trial memorandum that "Westwood does not contend that the *de facto* merger of People's into Iroquois imposed *operator* liability on NFGC for BGC's operations at the Site between 1901 and 1917." Item 151, at 3. It also notes that BGC could not have merged into Niagara in 1921 because BGC was liquidated as a result of the 1917 receiver's sale to Judge. Item 151, at 30.

3. Specifically, on page 22 of Order I, the court's statement that: "[L]ikewise, Westwood contends that Breitman's admission" does not relate to the facts in this action and should be disregarded. On page 41, the court referred to the "acquisition of BGC [Buffalo Gas Company] on behalf of NFGC by Judge in 1917" and "the sale of BGC to Niagara in 1921." These statements are not correct. Judge acquired the assets of BGC in 1917, and Niagara acquired the assets of BGC in 1921. Similarly, on page 45, the statement that Judge was the "owner of BGC" is incorrect. Judge owned the BGC assets. On page 42, the court stated: "This created an awkward corporate sandwich, with People's at the center and BGC as both an owner and lessee of the site." This statement is incorrect because BGC never owned the site. People's held title to the site from 1898 until the foreclosure sale to Iroquois in 1925.

With this in mind, it is not disputed that People's was the title owner of the site from 1898 to 1925. Despite the transfers of People's stocks and bonds throughout this period, the assets of People's, including the site, were only transferred as a result of the November 24, 1925, foreclosure sale. Item 151, at 27–28.

National Fuel contends that central to the court's finding that Iroquois was a successor to People's under the de facto merger doctrine are the court's two predicate findings that from 1901 to 1925 there was a joint venture between BGC and People's and that in 1921 Niagara succeeded BGC under the de facto merger doctrine. National Fuel argues that both of these findings are erroneous; consequently, the court's ultimate finding that Iroquois succeeded to the liabilities of People's must be reconsidered and amended. Item 149, at 9–10; Item 154, at 1. National Fuel further argues that because those findings were "central" and "critical" elements of the court's conclusion that National Fuel is liable, it fails to see how the court can reach the same conclusion without them. Item 154, at 2–3.

National Fuel also contends that ownership liability under CERCLA can be imposed upon a tenant under certain circumstances comparable to BGC's occupation of the People's premises; therefore, the fact that legal title remained with People's does not necessarily mean that only People's would be liable as the owner of the site from 1898 to 1925. Item 154, at 10–11. National Fuel submits that mere technical residence of title to the site in People's does not preclude a finding that BGC was the de facto owner. National Fuel argues that the circumstances of 1899 through 1901[4] support a finding that successorship must have occurred in 1901 with a de facto

merger of People's into BGC; therefore, People's was not available to undergo such a merger into Iroquois in 1925. *Id.*

As this court stated earlier, the court recognizes that it made some mistakes in Order I; however, a separate analysis of ownership and operation of the site is crucial to determining liability. After careful thought, the court finds that the record supports a finding that Iroquois is the corporate successor to People's without finding that: (1) BGC and People's operated the site under circumstances similar to a joint venture from 1899 to 1901; and (2) BGC underwent a de facto merger into Niagara in 1921. At no time did the court say that these additional two findings were "central" or "critical" to a finding of a People's–Iroquois de facto merger as National Fuel argues. *Cf.* Item 149, at 10; Item 154, at 2–3. Further, while the court attempted to make sense of and account for the chain of transactions from 1899 to 1925 in Order I, the court recognizes in this amended order that it does not have to account for the complete operations history in order to find ownership liability. Rather, to find ownership liability, the court needs only to consider whether Iroquois is the corporate successor to People's.

In *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), the Second Circuit reminded that "[o]ur construction of CERCLA does not begin with this case." The Second Circuit reemphasized that CERCLA is a "broad remedial statute," *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1197 (2d Cir.1992) (*"Murtha I"*), and was enacted with the purpose of "[f]irst, assuring that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." *B.F. Goodrich v. Betkoski,*

---

**4.** National Fuel lists these circumstances as follows: (1) BGC acquired substantially all of People's stocks and bonds; (2) BGC disregarded the separate corporate identity of People's and controlled and dominated People's; (3) People's effectively ceased operations in 1901; (4) BGC occupied and operated the

People's premises as its own under a lease that required no payment of rent to People's or any other remuneration to People's; and (5) BGC assumed under the lease the day-to-day liabilities of People's, including taxes, utilities, and maintenance expenses. Item 154, at 10–11.

99 F.3d at 514 (quoting S.Rep. 848, 96th Cong., 2d Sess. 13 (1980) (Senate Report), reprinted in 1 Senate Comm. on Env't and Pub. Works, Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), at 305, 320 (1983) (Leg. Hist.)). "As a remedial statute, CERCLA should be construed liberally to give effect to its purposes." *Id.* Further, "CERCLA is entitled to a construction that advances its primary goals." *Id.* at 519.

In addition, the Second Circuit explicitly stated that "[i]n our view, CERCLA imposes successor liability." *Id.* at 518; *see also North Shore Gas Co. v. Salomon, Inc.,* 152 F.3d 642, 649 (7th Cir.1998) ("[E]very circuit confronted with the question has determined that Congress intended successor liability to apply in the context of CERCLA.").[5] In determining what test of successor liability to apply, the Second Circuit held that "[b]ecause the substantial continuity test is more consistent with the Act's goals, it is superior to the older and more inflexible 'identity' rule." *Betkoski,* 99 F.3d at 519.

> The substantial continuity approach:
> considers a series of factors in determining whether one corporation is the successor to another: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.

*United States v. Carolina Transformer Co.,* 978 F.2d 832, 838 (4th Cir.1992).

■ Evaluating the eight factors above, the court finds that Iroquois is the corporate successor to People's. Although the record does not contain files as to the employees and personnel operating the site during this period, there was continuity of management and personnel. When Iroquois began operating the site in 1922, Iroquois elected People's directors and selected its officers. Thomas Weymouth was President and a Director of both Iroquois and People's. William Cusak and Harry Palmer were both Directors of People's and Vice–Presidents of Iroquois. Cusak was also Treasurer of Iroquois. Palmer had been employed by Judge at the site since 1917. Joseph Meyers was a Director, Secretary, and Treasurer of People's and was Assistant Treasurer of Iroquois and had been employed at the Buffalo Gas Plant since 1920. Daniel Kenefick was Vice–President and a Director of People's, and also was, or had been, counsel to Judge, Iroquois, Niagara, and People's. The court finds this identity of officers and directors as strong evidence of substantial continuity from People's to Iroquois.

Factors three and four are met because Iroquois retained the same production facilities in the same location and produced the same product. While factor five is not met because the name changed, factors six and seven are met because there were continuity of assets and continuity of general business operations. Iroquois continued to use People's assets in the same way and for the same purposes. Overall, the only real effect of the foreclosure sale in 1925 is that Iroquois operated the site as a lessee before the sale and as an owner after the sale. As a lessee, Iroquois had already taken responsibility for paying the taxes and insurance and for maintaining

**5.** In *North Shore Gas Co. v. Salomon, Inc.,* 152 F.3d 642, 649 (7th Cir.1998), the Seventh Circuit applied the successor liability doctrine in the CERCLA context. The Seventh Circuit stated that "[t]he successor liability doctrine serves the purpose of identifying transactions where the essential and relevant characteristics of the selling corporation survive the asset sale, and it is therefore equitable to charge the purchaser with the seller's liabilities." *Id.* at 651. The court found successor liability because it found that "the Coke Company merely continued on in the Gas Company after implementation of the 1941 Plan." *Id.* at 655.

the property. Factor eight is not exactly met because there is no evidence that Iroquois held itself out as a continuation of the previous enterprise. However, because I have found that factors one, two, three, four, six, and seven have been met, I conclude that Iroquois did in fact hold itself out as a continuation of the previous enterprise.

In viewing the totality of the factors above, the court comes to the same realization that the Seventh Circuit came to in *North Shore Gas* —namely, the result of the 1925 foreclosure sale left Iroquois in essentially the same position as it was in before the sale. *See North Shore Gas*, 152 F.3d at 651–55. Iroquois was located at the same site, was manufacturing the same product, was already responsible for maintaining the property and paying the taxes and insurance, and retained many of the same officers and directors. The only real difference was that Iroquois assumed liability on fifteen missing bonds. That is, Iroquois owned 2,085 of the 2,100 People's bonds before the 1925 foreclosure sale. The fifteen bonds that Iroquois did not own were termed "missing," and the foreclosure sale was held in order for Iroquois to obtain clear title to the site. Iroquois agreed to a judicial decree which required it to pay the amount due on the fifteen missing bonds if such bonds were presented within twenty years thereafter. Based on the foregoing, the court finds that Iroquois is the corporate successor to People's under the substantial continuity doctrine.

In addition to finding Iroquois as the corporate successor to People's under the substantial continuity doctrine, the court also finds Iroquois as the corporate successor based upon the de facto merger exception. In *Arnold Graphics Indus. v. Independent Agent Ctr.*, 775 F.2d 38, 42 (2d Cir.1985) (quoting *Ladjevardian v. Laidlaw–Coggeshall, Inc.*, 431 F.Supp. 834, 838 (S.D.N.Y.1977)), the Second Circuit set forth the four elements required in order to find a de facto merger: "there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation, and the assumption of liabilities by the purchaser."

Here, the first element is met because there is continuity of the selling corporation. National Fuel admits that Iroquois itself operated the site from 1922. As the substantial continuity analysis demonstrated, Iroquois operated the same site, produced the same product, and had the same directors. After the sale of People's assets to Iroquois in 1925, Iroquois continued to use those assets in the same way for the same purposes. Further, the identity of officers and directors between People's and Iroquois makes it reasonable to infer that there was a significant continuity of management and personnel.

The second factor, continuity of shareholders, is also met. Although the Second Circuit stated in *Arnold Graphics* that this element is "accomplished by paying for the acquired corporation with shares of stock," it is not necessary that the assets be paid for with stock in the acquiring corporation. *Arnold Graphics*, 775 F.2d at 42. There was no exchange of stock for assets in *Arnold Graphics*. There, after acquiring 100 percent of the stock of the seller corporation, the purchaser corporation liquidated the seller by transferring its assets and liabilities to the purchaser's books. In that liquidation, the purchaser did not issue its stock to the seller.

In the case at bar, Iroquois already owned over ninety percent of the stock of People's prior to the foreclosure sale. Item 147, at 9, 15, 17–19. When Iroquois merged with Niagara in 1922, Iroquois took possession of $2,702,400 of the $3,000,000 par value stock issued by People's that the stockholders of Niagara purchased from Judge on April 9, 1921. Item 147, at 15; Exh. 15. Iroquois also took possession of all of the BGC assets and

$2,045,000 of the $2,100,000 bonds issued by People's that the stockholders of Niagara also purchased from Judge. Item 147, at 15.

Iroquois paid the $375,000 purchase price for the People's property that it successfully bid for at the November 24, 1925, foreclosure sale by turning in forty People's bonds and interest coupons acquired from a number of investors. These bonds, with a face value of $83,603.52, were subsequently canceled and destroyed. Iroquois then turned in the 2,045 People's bonds in payment of the $278,396.58 balance due. Of that balance, $38,610 was held as a reserve for the fifteen missing bonds, as held by a court decree.

Significantly, in 1926, the PSC approved Iroquois' request to issue capital stock to NFGC in order to raise the $83,603.52 paid to acquire the forty additional bonds, and the $38,610 for the fifty missing bonds. Item 147, at 19; Proposed Finding 68. Thus, Iroquois paid part of the purchase price at the foreclosure sale by issuing stock and paid part by turning in People's bonds. Viewing the transactions as a whole, there was continuity of stockholders from before and after the foreclosure sale. Accordingly, the second factor is met.

The third factor, cessation of operations, is met. National Fuel contends that People's continued to exist on the corporate register and that People's continued to elect officers and maintain an office for seven more years. However, even if that is true, People's did not hold itself out in the marketplace as a supplier of gas—it had no markets, assets, stock, or additional leases. In *Arnold Graphics,* the Second Circuit stated that "there is no requirement that all of the events that are necessary to a finding of de facto merger occur at the same time." *Arnold Graphics,* 775 F.2d at 42. As part of its reasoning, the Second Circuit cited *Knapp v. North American Rockwell Corp.,* 506 F.2d 361,

367 (3d Cir.1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452(1975), in which the Third Circuit held "a de facto merger was found even though the selling corporation was not dissolved until eighteen months after the sale and possessed valuable assets during the interim." *Arnold Graphics,* 775 F.2d at 42. The court reaffirms its finding in Order I that the third factor is met because the mere existence of a remaining "paper" corporation does not defeat the application of the de facto merger doctrine. *See United States v. Mexico Feed & Seed Co.,* 980 F.2d 478, 487 (8th Cir.1992).

The fourth factor, the assumption of People's liabilities, is also met. The only significant liabilities of People's at the time of the 1925 foreclosure sale were its liabilities to the owners of the fifteen missing bonds entitled to priority over the 2,085 People's bonds owned by Iroquois prior to the foreclosure sale. In order for Iroquois to obtain clear title to the site, Iroquois agreed to a judicial decree which required it to pay the amount due on the fifteen missing bonds, if such bonds were presented within twenty years thereafter. Furthermore, the record shows that Iroquois not only agreed to assume People's liabilities on those bonds, but Iroquois paid in full ($12,416.65) the estate of the owner of five of the missing bonds in 1930.[6] There is no record that any claims were made on the remaining ten bonds, and a review of the record indicates that there appear to be no other liabilities. In sum, the fourth factor is met, and Iroquois assumed People's liabilities.

■ Although National Fuel is correct that a lessee can be liable as an owner under CERCLA in certain circumstances, the lessee is liable as an additional owner, not in the place of the lessor/title holder. *United States v. A & N Cleaners and Launderers, Inc.,* 788 F.Supp. 1317, 1332–

---

6. The court notes that there is a discrepancy in the papers as to the year that Iroquois paid off five of the missing bonds. Some of the papers list the year as 1930 and others 1932. It appears that the correct year is 1930.

34 (S.D.N.Y.1992). In *A & N Cleaners*, cited by National Fuel, the district court stated that "[m]ere ownership of the property on which the release took place is sufficient to impose liability under § 107(a), regardless of any control or lack [of] control over the disposal activities." *Id.* at 1332. Thus, the fact that BGC might also be liable as an additional owner for the period that it operated the People's site under the lease does not affect People's liability as the title owner of the site.[7]

 The court rejects National Fuel's argument that People's had merged into BGC by 1901 such that People's was unable to merge into Iroquois in 1925.[8] As this court stated in Order I, "[t]he general rule is that where a company sells or otherwise transfers *all its assets* to another company, the latter is not liable for the debts and liabilities of the transferor." 15 FLETCHER CYCLOPEDIA CORPORATIONS § 7122 (emphasis added). BGC never acquired all of People's assets. Most significantly, BGC never owned the site.[9] Rather, BGC remained an independent corporation, manufacturing gas on the leased People's site. Item 147, at 9. People's assets were not transferred until the 1925 foreclosure sale to Iroquois.

Finally, National Fuel argues that because this case involves a dispute between two private parties, there is no risk that the government or the taxpayers would bear any of the cleanup costs. Thus, National Fuel contends that relaxation of even one of the de facto merger factors in *Arnold Graphics* is inappropriate. National Fuel cites *United States v. Kayser–Roth Corp.*, 910 F.2d 24, 26 (1st Cir.1990), for the proposition that the doctrine that remedial statutes such as CERCLA should be liberally construed is limited to situations where a strict construction would frustrate the legislation's purpose. Item 149, at 14. National Fuel also cites *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3d Cir.1988), for the proposition that in the case of CERCLA, that purpose is to avoid imposing the costs of the cleanup upon the taxpayers. Item 149, at 14.

While National Fuel is correct that *Kayser–Roth* stands for the proposition that a liberal construction should govern where strict construction would frustrate the statute's purpose, *Kayser–Roth*, 910 F.2d at 26, National Fuel proceeds to argue that liberal construction should be used only in cases in which costs would fall on the taxpayers. This statement is plainly not supported by *Kayser–Roth.* Nowhere in the case does the First Circuit provide for curtailing liberal construction of CERCLA, "a remedial statute."

Furthermore, while *Smith Land* states that Congress intended that the burden should fall on the taxpayer only if there are no responsible parties to pay, *Smith Land*, 851 F.2d at 92, *Smith Land* does not state that the successor liability doctrine should be given strict construction if there are responsible parties. Rather, a fair reading of *Smith Land* indicates that "Congress intended to impose successor liability" in CERCLA cases. *Id.*

Therefore, for the foregoing reasons, the court finds that the 1925 foreclosure sale

---

7. The court notes, however, that National Fuel can raise this argument in any future allocation proceedings concerning its equitable share of liability.

8. The court notes that while National Fuel argues that People's merged into BGC in 1901 so that it could not merge into Iroquois in 1925, National Fuel also argues that People's remained a viable corporation for seven years after the 1925 foreclosure sale. *See* page 15, *supra.* These arguments are incon-

sistent, and National Fuel cannot have it both ways.

9. The court noted in footnote 2 that it was mistaken in Order I, at page 42, when it stated that "This created an awkward corporate sandwich, with People's at the center and BGC as both the owner and lessee of the site." BGC leased the site, but never owned the site. People's was the title owner of the site from 1898 until the foreclosure sale in 1925.

resulted in the de facto merger of People's into Iroquois. As a result of the substantial continuity and de facto merger exceptions to the doctrine of successor liability, National Fuel is liable under section 107(a)(2) of CERCLA as an owner of the site from 1898 to 1925.

## II. *National Fuel's Liability as an Operator of the Site from 1917–1921*

National Fuel argues that the record does not support the court's finding in Order I that Judge acted as an agent for NFGC when he purchased the BGC assets in 1917 and operated them from 1917 to 1921. Item 149, at 1–9. While National Fuel makes numerous arguments in its post-trial submissions, these arguments essentially boil down to two: (1) the court misapplied the Public Service Commission ("PSC") Law; and (2) the facts demonstrate that Judge purchased the BGC assets for his own use and benefit.

With respect to the first argument that the court misapplied the PSC Law, National Fuel does not submit any new evidence to support its contentions. Rather, it continues to argue that the PSC provision relied upon by the court only explains why NFGC itself did not attempt to acquire the BGC assets at the receivership. Item 154, at 4. It submits that NFGC could have used, as it ultimately did in 1921, an existing or newly formed, wholly owned subsidiary to acquire the BGC assets. *Id.* Thus, National Fuel argues that it had no motive or incentive to employ Judge as its "non-secret agent." *Id.*

In Order I, the court focused on a portion of section 70 of the PSC law that provided that no gas corporation could transfer its works to any person or corporation without the permission of the PSC, but found that this law did not require PSC approval of transfers by an individual. *See* Item 147, at 26. I found that this law is a plausible explanation why NFGC could not acquire the BGC assets on its own and would have needed an agent.

Westwood submits that the more significant driving force for vesting legal title in Judge is found in a different provision within PSC Law section 70. Item 151, at 6, 8–9. The more telling part of section 70 provides that: "no stock corporation of any description ... other than a gas corporation ... shall purchase or acquire, take or hold, more than ten per centum of the total capital stock issued by any gas corporation." Item 151, at 8, and Appendix A, at 932. Laws of New York, Chapter 429, 130th Session, at 892. This explains why NFGC, a stock corporation that was not a gas corporation, could not have acquired the BGC assets and would have violated the Public Service Law in 1917 because the BGC assets included approximately ninety percent of the total capital stock issued by People's, a gas corporation. Item 151, at 8–9. The ten-percent limitation on ownership of stock in a gas corporation applied only to non-gas stock corporations, not to individuals like Judge.

Furthermore, this part of section 70 of the PSC Law counters National Fuel's argument that it could have formed a wholly owned subsidiary in 1917 as it ultimately did in 1921. In 1917, such a wholly owned subsidiary, either new or old, would have had to have been a gas corporation; and to be a gas corporation, the wholly owned subsidiary would have to own a gas plant. Item 156, at 19. Thus, NFGC could not merely create a subsidiary; it needed a subsidiary that owned a gas plant. Westwood notes that the law changed in 1918, taking out the ten-percent limitation and allowing a stock corporation with PSC approval to purchase assets that included the stock of a gas corporation. Chapter 420, Laws of New York, 1918, at 1270. Item 151, at 8, n. 10.

National Fuel also argues that PSC review and approval were required regardless of who purchased the BGC assets. However, there is no evidence that the PSC ever reviewed or approved Judge's acquisition of the BGC assets. Furthermore, even if PSC approval did occur,

Judge was not a stock corporation, and so he was not barred by the ten-percent requirement. Accordingly, by having Judge acquire the assets, stock, and bonds in his own name, but for the benefit of NFGC, NFGC was able to bring the BGC assets under its umbrella without violating the ·letter of the law.

With respect to National Fuel's second argument that the facts demonstrate that Judge purchased the BGC assets for his own use and benefit, National Fuel does not submit any new evidence, but rather relies on the same arguments that it made at trial. It argues that Judge's testimony constituted "unequivocal statements of fact" that are flatly inconsistent with the court's conclusion that Judge purchased the assets as an agent of NFGC under an agreement to dispose of those assets as NFGC might direct. Item 149, at 8. It insists that the court cannot find an agency relationship without also finding that Judge perjured himself before the PSC. National Fuel argues that since Judge's wife also signed the blank deed, that fact supports a finding that Judge was acting for himself, rather than for the benefit of National Fuel. In addition, National Fuel reiterates its position that NFGC's accounting treatment of the money used to purchase the BGC assets as a loan demonstrates that Judge purchased the assets for his own use and benefit.

As discussed in Order I, by 1912 NFGC had studied the possibility and the merits of acquiring the BGC assets. Item 147, at 21. In July 1912, a report was issued recommending the purchase of the BGC assets and specifically identified the People's site as the site for future expansion of gas-making capacity. Item 147, at 21; Exh. 177. In November of 1912, Buffalo National Gas Fuel Company, whose stock was owned by National Fuel, merged with Iroquois.

In Order I, this court found that Judge's testimony before the PSC was cryptic and merely represented Judge's opinion as to the nature of his legal obligations to NFGC. Item 147, at 32–33. The court rejects the argument of National Fuel that "the Court cannot find an agency relationship without also finding that Mr. Judge perjured himself to the PSC." Item 149, at 8. Rather, I reaffirm my finding that Judge was able to answer the questions truthfully, while leaving a lot unsaid. Judge did not unequivocally reject the notion that he was acting in the interests of NFGC, but instead used evasive language such as: "legal owner with a moral responsibility", "not directly", and "not as I understand the matter." Judge did not state that he purchased the assets free and clear and that he could do whatever he wanted with them.

In 1918, the PSC did not make a finding as to whether Judge had acted as NFGC's agent when he purchased the BGC assets in 1917 because that hearing was a rate proceeding, at which the question of agency came up as a collateral matter.[10] At oral argument, when the parties were asked whether the PSC ever made a finding on the Judge-agency question, both sides acknowledged that it had not. Item 156, at 6–9. The failure of the PSC to rule on whether Judge acted as agent for NFGC cannot be interpreted as a finding that Judge was not an agent for NFGC.

In addition, the mere fact that NFGC's accounting treatment of the funds that ultimately went towards the purchase of the BGC assets identified the funds as a "W.J. Judge loan account" does not prove that Judge purchased the property on his own behalf for his use. While National Fuel argues that it "loaned" Judge $2.6 million, this was not an ordinary loan. National Fuel reversed the interest charges on the loan account in 1917 and 1918, and there is

---

**10.** This proceeding came before the Public Service Commission on the complaint of Mr. Buck, who was then the Mayor of the City of Buffalo, against Judge and People's Gas, Light, and Coke Company of Buffalo as to the price to be charged for the manufacture of gas. Trial Transcript, at 105–06.

no evidence that Judge paid any of the interest. Item 147, at 11–12.

Judge did not invest any of his own money from 1917 to 1921, and National Fuel does not rebut that the documents filed with the PSC state that Judge did not have a return on investment. Most significantly, National Fuel is unable to explain why it would "loan" some 7.5 percent of its total assets interest-free to Judge, who at the time was Vice–President and Secretary of NFGC, to start an independent business potentially in competition with its own interests-unless, of course, one looks at the restrictions that section 70 of the PSC Law placed upon stock corporations, like NFGC, who could not own more than 10 percent of a gas corporation.

Further, the NFGC Board authorized a guarantee of payment for $35,819 for a new water gas apparatus to be installed at the site. This interest-free "loan" to a potential competitor defies common business sense. In addition, when Judge was required to post a $125,000 bond to cover the sale price of People's property, the NFGC Board supplied Judge with the bond and agreed to hold Judge harmless from any loss. National Fuel is unable to offer a reasonable explanation as to why NFGC agreed to reimburse Judge for any losses. Rather, based on the foregoing, the reasonable inference is that Judge had an agency relationship with NFGC.

Finally, National Fuel challenges the finding that the blank deed signed by both Judge and his wife serves as evidence that Judge was acting as NFGC's agent when he purchased the BGC assets in 1917. Item 154, at 6. The same arguments were made at trial and are now repeated. National Fuel argues that because Judge's wife also signed the blank deed, this supports a finding that Judge was acting for himself rather than for the benefit of National Fuel. While calling the court's attention to a number of New York cases explaining the rule of dower in force at that time, National Fuel is unable to cite any case law expressly stating the proposition that the wife of an undisclosed agent becomes seized in a right of dower.[11] The fact that she signed the blank deed is not proof that Judge was owner of the property or that he was not the agent of NFGC. Accordingly, the court declines to find that the fact that Mrs. Judge signed the October 1917 deed is proof that Judge was not an undisclosed agent of NFGC.

Upon careful consideration of the arguments presented by each side, the court reaffirms its finding that Westwood has carried its burden of proof and demonstrated that in light of all of the evidence, Judge acted as an undisclosed agent of NFGC when he purchased the BGC assets in 1917 and operated those assets until 1921. As such, the court finds National Fuel liable as an operator of the site from 1917 to 1921.

## III. *People's and BGC's Operations from 1898 to 1901—Whether Iroquois Assumed People's Operator Liability for Operations from 1898 to 1901*

Westwood asserts that Iroquois assumed People's operator liability at the site from 1898 to 1901 because Iroquois assumed all of People's liabilities as part of the de facto merger of People's into Iroquois after the 1925 foreclosure sale. Item 151, at 3. In Order I, I found that People's was incorporated in December 1897, constructed a Merrifield–Prescott–type water gas manufacturing apparatus on the site in 1898, and produced gas on the site from 1898 to 1901. Item 147, at 4. Thus, it is not disputed that People's operated the site from 1898 to 1901. The question be-

---

11. Assuming that National Fuel is correct—if Judge was the owner, then his wife would have a dower interest and would have to sign a deed to transfer title—this does not make for conclusive proof that he held property as owner. It may simply indicate that Judge himself, and the officers of NFGC chose a conservative path. Having Mrs. Judge sign the deed would tend to obviate any dispute about any future claim by Mrs. Judge or her representative.

fore the court is whether Iroquois has assumed People's operator liability for this time period. Because the court found that Iroquois is the corporate successor to People's under both the substantial continuity and de facto merger doctrines, Iroquois has assumed all of People's liabilities, including People's operator liability of the site. Therefore, National Fuel, which admits that it is the corporate successor to Iroquois, is also liable as an operator of the site from 1898 to 1901.

## IV. *Leave for Immediate Appeal Under 28 U.S.C. § 1292(b)*

National Fuel submits that if the court declines to amend Order I as National Fuel requests, then the court should certify that order for immediate appellate review. Item 149, at 32–36. Title 28 U.S.C. § 1292(b) provides, in relevant part, that:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such an order involves a controlling question of law as to which there is substantial ground for difference of opinion and that immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

National Fuel contends that Order I contains errors on three pure issues of law, and that an immediate appeal therefrom may materially advance the ultimate outcome of this litigation. It argues that a determination from the Second Circuit on the various corporate successor liability issues will settle whether National Fuel must shoulder the disputed liabilities or whether those liabilities will be treated as orphan shares in connection with any equitable allocation of CERCLA liability. And, if the successor liability determination is in error, National Fuel argues that its success would obviate the need for any allocation trial. Item 149, at 35.

Westwood argues that the controlling questions in Order I are factual, not legal;

therefore, that order is not appropriate for immediate appellate review. Westwood also contends that there is no substantial ground for a difference of opinion because the court applied the law in accordance with precedent from this circuit. Westwood submits that even though the court found National Fuel liable as an owner, at an allocation trial National Fuel will still be able to present evidence and make arguments that the release of hazardous substances was due solely or in some substantial part to the conduct or omission of Westwood or some other third party. Westwood asserts that an interlocutory appeal would only serve to prolong this litigation and, if successful, make the trial more complicated by requiring additional fact questions and legal issues. Item 151, at 34–39.

■ The court recognizes that the corporate successor liability issues are complex. Further, it appears that there may be a "controlling question of law as to which there is substantial ground for difference of opinion." While the Second Circuit stated in *Betkoski* that the substantial continuity approach is the proper one to apply, *Betkoski,* 99 F.3d at 519, the Second Circuit has not applied this approach to any other case. Thus, the court believes that immediate appeal from this order may materially advance the ultimate termination of the litigation. Given the complexity of the case and the fact that only allocation issues remain, the allocation phase will be straightforward once these controlling issues of successor liability are settled. In contrast, if immediate appeal from this order is not granted, then the allocation phase may proceed; and if the Second Circuit determines on appeal that this order was incorrect, then the allocation phase will be for naught. Therefore, National Fuel's motion to certify this order for immediate appellate review is granted.

## CONCLUSION

For the foregoing reasons, the court denies National Fuel's motion to amend this

court's September 1997 findings of fact and conclusions of law. The court agrees that certain modifications in its analysis are appropriate, and has made such modifications. Nevertheless, the court affirms its ultimate findings that National Fuel is liable: (1) as the successor to People's, who owned the site from 1898 to 1925; (2) as the successor to People's, who operated the site from 1898 to 1901; and (3) as an operator of the site from 1917 to 1921. Furthermore, the court grants National Fuel's motion to certify this order for immediate appellate review.

So ordered.